NO. 23-10069-D

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

### UNITED STATES OF AMERICA,
*Plaintiff/appellee,*

v.

### DARRYL ODELY, JR.,
*Defendant/appellant.*

---

### On Appeal from the United States District Court
### For the Southern District of Florida

---

### BRIEF OF THE APPELLANT
### DARRYL ODELY, JR.,

---

**MICHAEL CARUSO**
  **Federal Public Defender**
**SARA W. KANE**
  **Assistant Federal Public Defender**
  **Attorney for Appellant**
  **1 E. Broward Blvd., Suite 1100**
  **Fort Lauderdale, Florida 33301**
  **Telephone: 954-356-7436**

### THIS CASE IS ENTITLED TO PREFERENCE
### (CRIMINAL APPEAL)

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### United States v. Darryl Odely, Jr.
### Case No. 23-10069-D

Appellant, Darryl Odely, Jr. files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1:

Budhrani, Anshu

Calderon, Marx

Caruso, Michael

Dimitrouleas, Hon. William P.

Gonzalez, Juan Antonio

Hunt, Hon. Patrick M.

Kane, Sara W.

Koontz, M. Catherine

Lapointe, Markenzy

Lewis, Jr., James Stewart

Matzkin, Daniel

Michelen, Juan

Minor Victim

Mulvihill, Thomas J.

Odely, Jr., Darryl

Phillips-Williams, Bonnie

Rubio, Lisa Tobin

United States of America


_/s/ Sara W. Kane_
SARA W. KANE
Assistant Federal Public Defender

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Odely respectfully submits that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision-making process.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CITATIONS ............................................................. v

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ................................................................... x

STATEMENT OF THE ISSUES ................................................... 1

STATEMENT OF THE CASE ..................................................... 2

I.     Course of Proceedings and Disposition in the District Court ........ 2

II.    Statement of Facts ......................................................... 5

       a.   Mr. Odely's statement to the FBI .................................. 5

       b.   The rest of the government's case ................................ 8

       c.   Mr. Odely's decision not to testify ............................. 20

       d.   Closing arguments ................................................ 24

       e.   Jury instructions ................................................ 24

       f.   Jury deliberations and verdict ................................... 27

III.   Standards of Review ...................................................... 30

SUMMARY OF THE ARGUMENT ................................................. 32

ARGUMENT AND CITATIONS OF AUTHORITY ............................... 35

I.   Mr. Odely was convicted of the non-offense of "using force, threats of force, or coercion to commit the offense," under a strict-liability theory ......................................................... 35

    a.   The indictment affirmatively alleged a non-offense ............... 36

    b.   The special verdict form constructively amended the indictment and confirms that Mr. Odely was convicted of a non-offense ........................................................................ 38

    c.   While no showing of prejudice is required, Mr. Odely was substantially prejudiced ................................................. 43

II.  The district court erred by allowing the case agent to offer a harmful opinion based on hearsay ................................................. 47

III. The district court erred by admitting, and then failing to mitigate, the transcript's reference to Mr. Odely's prior sentence .......................................................................... 53

IV.  The district court violated Mr. Odely's right to testify ................. 57

V.   The district court abused its discretion by denying the jury's request for a transcript of the testimony ....................................... 65

VI.  Cumulative errors deprived Mr. Odely of a fair trial .................... 68

CONCLUSION ......................................................................... 71

CERTIFICATE OF COMPLIANCE..........................................................73

CERTIFICATE OF SERVICE.................................................................74

# TABLE OF CITATIONS

**<u>Cases</u>:**

*Bonner v. City of Prichard, Ala.,*

    661 F.3d 1206 (11th Cir. 1981) ...................................................... 50

*Davis v. Washington,*

    547 U.S. 813 (2006) ........................................................................ 31

*Martinez v. Ylst,*

    951 F.2d 1153 (9th Cir. 1991) ...................................................... 65

*Michelson v. United States,*

    335 U.S. 469 (1948) ........................................................................ 53

*Nejad v. Att'y Gen., State of Georgia,*

    830 F.3d 1280 (11th Cir. 2016) .................................................... 65

*Nichols v. Butler,*

    953 F.2d 1550 (11th Cir.1992) ...................................................... 65

*Old Chief v. United States,*

    519 U.S. 172 (1997) .............................................................. 53, 56

*United States v. Anderson,*

    1 F.4th 1244 (11th Cir. 2021) ...................................................... 57

*United States v. Baker,*

    432 F.3d 1189 (11th Cir. 2005) ...................................................... 31

*United States v. Brown,*

    548 F.2d 1194 (5th Cir. 1977) ....................................................... 50

*United States v. Cardenas-Flores,*

    974 F.2d 1343 (9th Cir. 1992) ....................................................... 68

*United States v. Drury,*

    396 F.3d 1303 (11th Cir. 2005) ...................................................... 49

*United States v. Farr,*

    536 F.3d 1174 (10th Cir. 2008) ...................................................... 38

*United States v. Hands,*

    184 F.3d 1322 (11th Cir.), *corrected,*

    194 F.3d 1186 (11th Cir. 1999) ................................................. 52, 69

*United States v. Iguaran,*

    821 F.3d 1335 (11th Cir. 2016) ...................................................... 30

*United States v. Innocent,*

    977 F.3d 1077 (11th Cir. 2020) ...................................................... 61

*United States Izurieta,*

    710 F.3d 1176 (11th Cir. 2013) ......................................... 35, 38, 44

*United States v. Keller,*

916 F.2d 628 (11th Cir. 1990) ............................................ 35, 38, 43

*United States v. Ly,*

646 F.3d 1307 (11th Cir. 2011) ......................................... 57, 63, 65

*United States v. Manati,*

697 F. App'x 683 (11th Cir. 2017) ..................................................... 49

*United States v. Margarita Garcia,*

906 F.3d 1255 (11th Cir. 2018) ..................................................... 68

*United States v. Pacchioli,*

718 F.3d 1294 (2013) ............................................................ 30, 67

*United States v. Pon,*

963 F.3d 1207 (11th Cir. 2020) ................................................. 30, 53

*United States v. Rivera,*

780 F.3d 1084 (11th Cir. 2015) ..................................................... 49

*United States v. Teague,*

953 F.2d 1525 (11th Cir. 1992) (en banc) ...................................... 57

*United States v. Walker,*

73 F.4th 915 (11th Cir. 2023) ......................................................... 42

*United States v. Whyte,*

    928 F.3d 1317 (11th Cir. 2019) ....................................................... 36

## **Statutory & Other Authorities**

U.S. Const., amend. V ........................................................................... 38

U.S. Const., amend. VI .......................................................................... 38

18 U.S.C. § 1591(a) ................................................. 36-39, 42-43, 46, 56, 63

18 U.S.C. § 1591(a)(1) ...................................... 1, 24, 32, 34-36, 40, 45, 69

18 U.S.C. § 1591(b)(1) ................................................................. 4, 32, 36

18 U.S.C. § 1591(b)(2) ..................................................................... 32, 36

18 U.S.C. § 1591(c) ......................................................................... 36-37

18 U.S.C. § 3231 .................................................................................. 10

18 U.S.C. § 3742 .................................................................................. 10

28 U.S.C. § 1291 .................................................................................. 10

Fed. R. Evid. 402 ................................................................................. 56

Fed. R. Evid. 403 ................................................................................. 56

Fed. R. Evid. 404(b) ............................................................................. 56

Fed. R. Evid. 801(d) ............................................................................. 48

Fed. R. Evid. 801(d)(1)(B) ................................................................. 49-50

Eleventh Circuit Pattern Jury Instructions (Criminal), Offense Instruction No. O63..........................................................24

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the defendant was charged with an offense against the laws of the United States. The court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States. The appeal was timely filed on January 4, 2023, from the final judgment and commitment entered on December 27, 2022, which disposes of all claims between the parties to this cause. (DE56; DE50).

# STATEMENT OF THE ISSUES

I.   Whether a defective indictment and special verdict form resulted in Mr. Odely's conviction for a non-offense, depriving the district court of jurisdiction.

II.  Whether the district court erred by allowing the case agent to testify that the victim had provided an out-of-court statement that was "basically the same" as her testimony.

III. Whether the district court erred by admitting a transcript referencing Mr. Odely's prior nine-year prison sentence, and, further, by failing to give a mitigating instruction.

IV.  Whether the district court's inquiry, in response to Mr. Odely's stated desire to testify, denied Mr. Odely—who ultimately did not testify—his right to testify.

V.   Whether the district court abused its discretion by denying a jury request for trial transcripts.

VI.  Whether Mr. Odely is entitled to reversal of his 18 U.S.C. § 1591(a)(1) conviction under the cumulative error doctrine.

# STATEMENT OF THE CASE

The appellant, Darryl Odely, was the defendant in the district court and will be referred to by name. The appellee, United States of America, will be referred to as the government. The record will be noted by reference to the document number as set forth in the district court's electronic docket sheet, unless noted otherwise.

Mr. Odely is incarcerated.

## I.   Course of Proceedings and Disposition in the District Court

Mr. Odely was initially arrested in April 2022, in the parking lot of a hotel, along with the victim, "D.M.C." Four month later, Mr. Odely was charged by federal indictment, as follows:

The Grand Jury charges that:

From on or about January 24, 2022, and continuing until on or about April 26, 2022, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

**DARRYL ODELY JR.,**

did knowingly, in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide, obtain, maintain, and solicit by any means a person, that is, MINOR VICTIM, knowing, in reckless disregard of the fact, and having had a reasonable opportunity to observe MINOR VICTIM, that means of force, threats of force, and coercion, and any combination of such means, would be used to cause MINOR VICTIM to engage in a commercial sex act, and MINOR VICTIM had not attained the age of 18 years and would be caused to engage in a commercial sex act, in violation of Title 18, United States Code, Sections 1591(a)(1), (b)(1), (b)(2), and (c), and 2.

(DE1).

Mr. Odely exercised his right to a jury trial. After a three-day trial, the jury found him guilty of the sole count in the indictment, and entered a special verdict, as follows:

### VERDICT FORM

We, the Jury in the above-captioned case, unanimously find:

As to the sole count of the Indictment, which charges Defendant **DARRYL ODELY JR.** with comercial sex trafficking:

GUILTY ___X___          NOT GUILTY _____

If you find the Defendant GUILTY, did you unanimously find that the Defendant **DARRYL ODELY JR.**:

(a) used means of force, threats of force, or coercion to commit the crime?

YES ___X___          NO _____

(b) knew, acted in reckless disregard of the fact that the Minor Victim was under the age of 18 years, or had a reasonable opportunity to observe the Minor Victim?

YES ___X___          NO _____

(DE27).

Mr. Odely moved for a new trial, arguing that the jury's verdict was contrary the law and weight of the evidence, the government did not prove that Mr. Odely used force, threats of force, or coercion to cause the

victim to engage in commercial sex, and that the district court erred in its response to the jury's request for trial transcripts. (DE33). The district court denied the motion. (DE34).

Prior to sentencing, United States Probation prepared a Presentence Report (PSR). That report reflected that Mr. Odely had spent nine years in prison for armed burglary of a dwelling, escape, battery on a law enforcement officer, and resisting an officer with violence. (PSR ¶¶ 29-30). He was released December 2020. *Id.* Mr. Odely told Probation that he was employed full-time at ProFi Construction from January to December 2021, and at a COVID testing site from January to April, 2022. (PSR ¶¶ 65-66).

At sentencing, Mr. Odely faced a 15-year mandatory minimum sentence, pursuant to 18 U.S.C. § 1591(b)(1). His advisory sentencing guideline range was 292 to 365 months imprisonment. (DE89:3).

During allocution, Mr. Odely appeared to concede that he learned D.M.C.'s true age at some point after meeting her (DE89:4-5), but he maintained his innocence as to the "force" subsection of § 1591, stating that he "was not a reason for her prostitution" (DE89:4), and he "didn't beat this young lady out here. [He] didn't force this young lady to do

anything[.]" (DE89:10). Mr. Odely attorney asserted that, when Mr. Odely learned D.M.C.'s true age, his client had "attempted to try to take her back to Orlando to be in her home, [but] she absolutely refused and threatened suicide and cut her wrist . . . in order not to go." (DE89:5).

After hearing argument from Mr. Odely, his friends and family members, the government, and the victim, the district court imposed 300 months' imprisonment, followed by five years of supervised release. (DE88:11-12; DE50).

Mr. Odely timely filed a notice of appeal. (DE56).

## II.    Statement of Facts

The above section includes facts pertinent to Mr. Odely's appeal. Additional relevant facts emerged from the trial proceedings, as follows:

### a. Mr. Odely's statement to the FBI.

Upon his August 2022 federal arrest, Mr. Odely waived his *Miranda* rights, and provided a video-taped statement to Federal Bureau of Investigation (FBI) agents. (DE38-7 (Gov't Ex. 17); Gov't Ex. 15)).

The government sought to admit Mr. Odely's videotaped statement, as well as a transcript of that statement, in its case-in-chief. (DE84:4). Mr. Odely asked the government to redact references to Mr. Odely's prior

criminal history from his statement to the FBI. (DE84:4-5). The government agreed. *Id.*[1] Mr. Odely ultimately objected to showing the jury even the redacted version of transcript. (DE85:124-26). The court overruled Mr. Odely's objection, and both the redacted video-taped statement, and the redacted transcript, were published to the jury. (DE85:126-28; Gov't Ex. 15; DE92-1 (Gov't "True" Ex. 16)[2]).

In the statement, FBI agents reassured Mr. Odely that they did not believe that he had forced or threatened D.M.C. to make her prostitute; nonetheless, they asserted that he eventually learned or suspected she was a minor, and that he assisted, and profited from, her commercial sex work. (DE92-1:11, 13-15, 24-26). Mr. Odely acknowledged having a relationship of sorts with D.M.C., whom he referred to as "Ciera," and

---

[1] Although the government told the court that it had made the redactions (DE85:125-26), Mr. Odely's defense attorney apparently assisted and or reviewed the government's transcript redactions. (DE84:4-5; DE85:129, 169).

[2] The transcript that was filed with the district court, as Government's Exhibit 16, was not redacted at all. (DE38-6). Docket entry 38-6 therefore does not reflect the version of Government's Exhibit 16 that was shown to the jury. (DE93). Pursuant to Mr. Odely's motion to correct the record (DE92), the district court added the Government's "True" Exhibit 16 (DE92-1), to the record on appeal. (DE93).

spending time with her from December 2021 until April 2022. (DE92-1:9, 13-14). However, he disclaimed knowledge that D.M.C. was a minor until after he was arrested with her in April 2022. (DE92-1:8, 14-15, 29). He admitted that he knew she worked as a prostitute, and that he was worried that he would be charged with sex trafficking once he learned that two women who had previously pimped D.M.C. were charged. (DE92-1:8, 18-19). He repeatedly denied involvement in, or profiting from, D.M.C.'s sex work. *See generally* DE92-1. He asserted that, although he became homeless while he was with D.M.C., he had nonetheless been steadily working since completing a nine-year prison sentence. (DE92-1:24, 28, 31, 44).

The district court noticed that the transcript still contained Mr. Odely's unredacted statement that he "did nine years" in prison. (DE85:129). The district court hoped that the jury had "missed" this reference, and it decided not to provide the transcript to the jury during its deliberations—despite, as the government pointed out, having already admitted the transcript into evidence. (DE85:130).[3]

---

[3] The district court maintains that the transcripts was admitted only as a demonstrative exhibit. (DE93).

**b. The rest of the government's case.**

Sometime between May and August 2021, at age 14, D.M.C. ran away from her family's home in the Orlando area. (DE85:56-57; DE37-1 (Gov't Ex. 1)). [4] D.M.C. had "just got[ten] out of jail" for violating probation for the offense of battery on a law enforcement officer. (DE85: 58). D.M.C. denied any abuse at home; she said that she ran away because she "just wanted to do what [she] wanted to do." (DE85:57). Once she was reported missing by her family, a violation of probation warrant was issued—as was a missing person flyer. (DE84:194-95, 199; DE37-1).

After running away from home, D.M.C. initially lived with a minor female friend, and "just partied": using drugs—like marijuana and Percocet—drinking alcohol. (DE85:59-61). D.M.C.'s 20-year-old boyfriend supported her financially. (DE85:59-62).

---

[4] Exhibits that were entered into the district court's electronic docket are first identified by both the docket entry number, and the exhibit number. Thereafter they are identified by exhibit number in the body of the brief, but by docket entry number in citations. Exhibits that were not entered into the electronic docket (audio-visual exhibits) are identified by exhibit number only.

D.M.C. and her boyfriend broke up, and she began to hang out at a "trap house," where she met adult woman known to her as "Keke." (DE85: 61, 64). Keke recruited D.M.C. to work for her as a prostitute. (DE85:10-12). D.M.C. stayed with Keke from August until November of 2021. *Id*. Keke provided D.M.C. with food, and drugs: marijuana, "beans"—some form of "uppers"—and alcohol. (DE85:65, 71). Keke took D.M.C. and another minor female to West Palm Beach to prostitute. (DE85:66). D.M.C. testified that Keke became abusive: she took all of her money, she was violent, she forced D.M.C. to fight other girls, and she made D.M.C. perform sex work with people that D.M.C. did not want to have sex with—including Keke herself. (DE85:12-13, 72-74).

D.M.C. left Keke to stay with "a trick," but she soon asked a friend come get her, because the customer "was really weird." (DE85:75). While she was staying with her friend, D.M.C. came across another adult woman, known to D.M.C. as "Skittles." (DE85:78). In November 2021, D.M.C. began to work as a prostitute for "Skittles." (DE85:12). D.M.C. was open to working as a prostitute again "because [she] needed the money." (DE85:80). D.M.C. continued to use marijuana, "beans," and Percocet. (DE85:84-86). D.M.C. said that Skittles eventually became

abusive, as well. (DE85:12-13, 86).

In December 2021, Skittles took D.M.C. on a trip to Fort Lauderdale. (DE85:13-14, 87). While there, Skittles' car broke down, and Skittles and D.M.C. ended up in Mr. Odely's car, and they went together to a "gambling spot." *Id.*

Skittles and D.M.C. told Mr. Odely that they were prostitutes. (DE85:91). Before D.M.C. left the gambling spot with Skittles, D.M.C. got Mr. Odely's phone number. (DE85:15, 89). That evening, D.M.C. and Skittles performed commercial sex acts with other customers. (DE85:90). The next evening, D.M.C. asked Mr. Odely to visit her. *Id.* Mr. Odely and D.M.C. then had unprotected sex—for which Mr. Odely paid extra—and he left. (DE85:15, 90-92). While D.M.C. acknowledged that Mr. Odely was only "a trick" to her at that time (DE85:90), she testified that she never had unprotected sex with customers. (DE85:35).

Soon after, D.M.C. and Skittles returned to Fort Lauderdale, and D.M.C. called Mr. Odely to arrange a visit. (DE85:94-95). When he arrived, D.M.C. refused to have sex because he had no money. (DE85:96).

Toward the end of December 2021, D.M.C. and Skittles returned to Fort Lauderdale, where they got into an argument. (DE85:17). D.M.C.

called Mr. Odely, asking him to pick her up. (DE85:17-18). Mr. Odely picked up D.M.C., and brought her to his mother's home. *Id.*

D.M.C. lived with Mr. Odely, at his mother's home for approximately two months. (DE85:18). When Mr. Odely's mother was evicted, D.M.C. and Mr. Odely lived in his car. (DE85:30). They would "clean up" at a McDonald's bathroom, and occasionally spend the night at a hotel. (DE85:36).

D.M.C. testified that she believed that she would not have to prostitute once she was living with Mr. Odely. (DE85:19, 36, 45). But she said that Mr. Odely soon explained that "we need money" and "he just couldn't find a job and he didn't want to work," so, he began to post online prostitution advertisements for D.M.C. (DE85:19-20). D.M.C. maintained that Mr. Odely "was not working" during the four months that they lived together, although he "volunteered" "doing COVID tests" "one time" (DE85:19-20, 44)—or, alternatively, he was paid, but only for "a couple weeks." (DE85:114).

D.M.C. testified that Government Exhibit 4 depicted online "MegaPersonals" advertisements offering D.M.C. for commercial sex in the Fort Lauderdale and West Palm Beach areas. (DE85:19-21; DE37-6

(Gov't Ex. 4)). While the advertisements contained photographs that D.M.C. took of herself, D.M.C. testified that she did so at Mr. Odely's request, and that everything else about the advertisements: the price of sex acts, the words used in the ad, the phone number listed, the MegaPersonals account itself, was Mr. Odely's work. (85:19-24, 26-27). D.M.C. said that she did not know how to use MegaPersonals, and had never posted an ad for herself. (DE85:25).

It was undisputed that D.M.C. and Mr. Odely used each other's cellphones. (DE85:51, 54, 153-54).

Darryl Odely was the listed "subscriber" for the two phone numbers listed in the MegaPersonals advertisements in Government Exhibit 4. (DE84:189-193; DE37-3 (Gov't Ex. 2b); DE37-5 (Gov't Ex. 3B); DE37-6). The email account darrylodely92@gmail.com was used to set up a MegaPersonals account; further, several MegaPersonals emails were sent to that email account. (DE84:237; DE38-8 (Gov't Ex. 18); DE39-10 (Gov't Ex. 28)).

Multiple texts from D.M.C. asked Mr. Odely to "bump my ad," which meant that she was asking him to "refresh" her MegaPersonals ad, to attract more customers. (DE85:51-55). In response to one such text,

Mr. Odely purportedly responded: "you don't want no fucking money . . . play that bump . . . ad game with another nigga." (DE85:55; (DE39-2:35 (Gov't Ex. 22)). Another text apparently shows D.M.C. requesting "her" MegaPersonals login information:

From: +17543672863 Lil Booty
To: +17865863017 (owner)

Or give me my login and shi

(DE40-12:43 (Gov't Ex. 42). Mr. Odely responded:

From: +17865863017 (owner)
To: +17543672863 Lil Booty

Dis my add tf u ain't make shit on this batch tf I'm not giving you shit

*Id.* D.M.C. replied:

From: +17543672863 Lil Booty
To: +17865863017 (owner)

Ok bumb my ad

*Id.*

D.M.C. testified that she would "sometimes" text with customers but that Mr. Odely handled the "majority" of the text negotiations with her customers. (DE85:26). D.M.C. also handled customer phone calls— under Mr. Odely's supervision. (DE85:29). Exchanges with several

potential customers were found on the phones connected to Mr. Odely. (DE85:144; DE40-3 (Gov't 33); DE40-4 (Gov't Ex. 34)).

D.M.C. testified that Mr. Odely transported her "outcalls," in his car—before it broke down—and, later, in his mother's red Chevy Cruz. (DE85:28-29; DE37-11 (Gov't Ex. 9)). D.M.C. testified that she had "like 30" dates while she lived with Mr. Odely (from late December 2021 to early April 2022). (DE85:44). D.M.C. testified that customers often paid her through the "Cash App" application, and that this money went to Mr. Odely's Cash App account—which she used. (DE85:31, 109). *See also* (D84:236) (discussing documentation from Cash App reflecting various transactions under an account under the name Darryl Odely, with multiple usernames, including "Darryl Odely, Little D, Leah Day X"); (DE38-10 (Gov't Ex. 19b)).

D.M.C. further testified that she continued to consume Percocet, as well as marijuana, and "beans," the latter of which Mr. Odely provided her with. (DE85:40-41).

D.M.C. and Mr. Odely maintained a sexual, and then romantic, relationship. (DE85:44, 99). D.M.C. testified that she stayed with Mr. Odely, "Because I loved him and I cared about him and that's who I

wanted to be with at the time." (DE85:38). She also simply "didn't want to" go back home to her family. (DE85:113).

D.M.C. nonetheless claimed that she was scared of Mr. Odely, who was violent toward her a "majority of the time":

> He would always hit me in my face, like make my nose bleed or like leave bruises on me and on my face and stuff. And like when I'd be trying to run from him, he'll run after me either like on foot or in his car . . .

> He would choke me out and be like I'm going to kill you. I almost killed you.

(DE85:37). D.M.C. further testified that Mr. Odely broke her old phone during an argument. (DE85:38). She speculated that he did so because that phone contained old messages and contacts, including local "tricks I used to come see a lot," and Mr. Odely "didn't want me contacting nobody." *Id.*

D.M.C. conceded that "most" of the purported violence between her and Mr. Odely stemmed from D.M.C.'s jealousy of Mr. Odely's relationship with the mother of his infant child. (DE85:108). She acknowledged that she saw this other woman in the courtroom during the trial. *Id.* Text messages confirmed that D.M.C. was upset by this relationship. (DE85:155-56). For example, when Mr. Odely spent

Valentine's Day in Orlando with this other woman, D.M.C. sent him the following messages:

From: +17543672863 Lil Booty
To: +17865863017 (owner)

Hoe u gonna regret being With me. U a whole duck out here u let hoes get to your Lil side bitch  u ain't shit  can nothing take back whT you be doing to me

From: +17543672863 Lil Booty
To: +17865863017 (owner)

Have a vday  wit Dat 0ussy hoe bc  done showed my why ppl give  on on ppl

From: +17543672863 Lil Booty
To: +17865863017 (owner)

Pussy nigga went to Orlando  left your other phone so she ain't go through the bih

From: +17543672863 Lil Booty
To: +17865863017 (owner)

Dumb ass nigga will. Get out the bed for a nasty ass hoe that disrespect your people stole your money and you still kissing her ass

From: +17543672863 Lil Booty
To: +17865863017 (owner)

Wanna party and go out and go to your ex dumb ass bitch do that on another bitch timing nigga you a whole fool outhere  bitch I ca trust you for shit you talk all that shir how a bitch ain't shot nigga you ain't shit then u doing dis on vday nigga is fuck you bc you don't give af about nobody but you and you can continue  to do that nigga bc  when I leave this will be the last time you will even see me and play in my head I'm not no fool so I don't know why you take me as one nigga I delete all of people out my mf life bc they square asf you square  ads nigga you think ima duck .

(DE40-12:13-15). Mr. Odely apologized to D.M.C. (DE40-12:21-32). D.M.C. rejected his apologies, stating, for example:

From: +17543672863 Lil Booty
To: +17865863017 (owner)
Pussy ass niiga following new hoes from Orlando bitch you deadazf

(DE40-12:32).

Two days later, text messages show that Mr. Odely tried to kick D.M.C. out. (DE40-12:32). D.M.C responded that she had to go to the hospital for her elbow. (DE40-12:33-37). Mr. Odely replied that he did not care, and that D.M.C. was going to go to jail. *Id*. Mr. Odely also stated that he did not want to "put his hands on her," and repeated that she should leave. *Id*. D.M.C. responded, "Come open the door." (DE40-12:37). Mr. Odely replied:



From: +17865863017 (owner)
To: +17543672863 Lil Booty
Come get your shit and go deliah



From: +17865863017 (owner)
To: +17543672863 Lil Booty
U a whole child fr my nigga



From: +17865863017 (owner)
To: +17543672863 Lil Booty
I can't believe I let you trick me bra fr

(DE40-12:38-39).

Their relationship nonetheless continued, and DMC later texted Mr. Odely about a dream where she "didn't have no baby." (DE85:56). When asked about that text message, D.M.C. confirmed that she got pregnant. (DE85:56).[5]

Despite agreeing with the government that Mr. Odely "made" her continue to perform sex work while pregnant, *id.*, and claiming that he was violent "a majority of the time," D.M.C. declined to characterize Mr. Odely as having "forced" her to perform sex work; she felt, instead, that he had "manipulated her." (DE85:47).

Eventually, the victim said that she, "didn't feel like having sex with [customers] anymore, so [her and Mr. Odely] started robbing them." (DE85::32). Mr. Odely thereafter helped her to "rob" "15-20" customers. (DE85:33). D.M.C. had also robbed customers before she met Mr. Odely. (DE85:115).

Meanwhile, law enforcement—trying to locate D.M.C.—had identified photographs of D.M.C. in MegaPersonals advertisements, offering commercial sex acts. (DE84:182-89). Initially, the

---

[5] D.M.C. was "visibly pregnant" during her testimony. (DE85:3-4).

advertisements listed D.M.C. in the Orlando area. (DE84:182-83, 199-202; 214-215). Law enforcement testified that the Orlando advertisements were posted by Rakia Smith (aka "Keke"), and then by Alexandra Phillippe (aka "Skittles"). (DE84:214-15). At the time of Mr. Odely's trial, Keke and Skittles were incarcerated for sex trafficking. *Id.*

Law enforcement next identified D.M.C. in MegaPersonals advertisements in Fort Lauderdale, and West Palm Beach. (DE84:182-89; DE37-6). Agents tracked a cellphone connected to a phone number from these advertisements—for which Mr. Odely was listed as the subscriber—to a Broward County hotel. (DE84:218-20).

Records from the hotel front desk confirmed that Mr. Odely and a "Ciera Martinez," were staying at the hotel. (DE84:239). These records included photocopies of a "Ciera Martinez" Pennsylvania Driver's License, a Florida driver's license for Darryl Odely, and the back of Darryl Odely's debit or credit card.(DE84:223; DE38-3 (Gov't Ex. 13)).

Agents soon located Mr. Odely and D.M.C. in the hotel parking lot. (DE84:225, 252). Once they were detained, Mr. Odely purportedly stated that:

> he had only known D.M.C. for . . . approximately a week . . .
> he had initially met her at another hotel within the area,

> believed her to be 19 years of age, from Pennsylvania and was
> assisting her getting hotel rooms because she was having
> issues paying cash.

(DE84:227). D.M.C. also told police that Mr. Odely "had no involvement"
with her commercial sex work, and that he did not know she was
underage. (DE85:107).

D.M.C. was taken into custody and interviewed at least two more
times, by law enforcement, prior to her trial testimony. (DE84:242;
DE85:120-22). The case agent testified, over defense objection, that the
victim's third out-of-court statement to law enforcement, in July 2021,
was "basically the same as her testimony." (85: 121-22).

### c. Mr. Odely's decision not to testify.

After the government rested, and Mr. Odely's Rule 29 argument
was denied, Mr. Odely told the court that he wished to testify. (DE85:156-
57). In response, with defense counsel's consent, the district court
conducted the following colloquy:

> [COURT]: Mr. Odely, you understand you have a
> constitutional right to testify?

> [ODELY]: I do, Your Honor.

> [COURT]: Do you understand you have a constitutional right
> not to testify?

[ODELY]: I do, Your Honor.

[COURT]: Your lawyers been to law school. He's tried a lot of cases. He gives the benefit of his legal advice but it's your life, you don't have to follow the advice. Do you understand that?

[ODELY]: Yes, Your Honor.

[COURT]: There may be strategies reasons for or against you're testifying. Do you understand that?

[ODELY]: Say that again, Your Honor.

[COURT]: There may be strategic reasons for or against your testifying. Do you understand that?

[ODELY]: Yes, Your Honor.

[COURT]: Right now, the jury doesn't know whether you're a convicted felon. If you take the stand and testify, the Government may be able to bring out that you have prior felony convictions if you do. Do you understand that?

[ODELY]: At this point, I'm fighting for my life. I have nothing to hide, sir.

[COURT]: But that may be a strategy reason for or against your testifying. Do you understand that?

[ODELY]: Understood, sir.

[COURT]: And whatever decision you make in this case, you pretty much going are going to be stuck with that decision. Do you understand that?

[ODELY]: Understood, sir.

[COURT]: So for example, if you decide to testify and it turns out that you're a lousy witness and get convicted, you can't complain about that later on because you decided to testify. Do you understand that?

[ODELY]: Understood, sir.

. . .

[COURT]: If you decide not to testify and if the jury comes back guilty, you can't come back later on and say, oh, Judge, if the jury would have just heard my side of the story, they would have let me go. Do you understand that?

[ODELY]: Understood, sir.

[COURT]: So again, whatever decision you make, it's your decision. You know you can listen to your lawyer's advice but it's your life. It's up to you to decide what you want to do. Do you understand that?

[COURT]: And have you had enough time to think about this and talk about it with your lawyer?

[ODELY]: Yes, I did, sir.

[COURT]: And is it your decision that you do or do not want to testify, or is it something you want to think about overnight? You have that right, too. You can think about it.

[MR. LEWIS]: Judge, in helping in that decision, I'd ask the Government . . . if they have the number of felony convictions, that they would use to impeach with so I can give him that number?

[MS. KOONTZ]: We have certified convictions. Felony convictions. He spent nine years in prison.

[MR. LEWIS]: So the number would be three.

[ODELY]: I want to testify.
. . .

[COURT]: All right. And obviously, I sent the jury home so you can do that first thing tomorrow morning at 9:00. If you change your mind, you can change your mind but if you don't change your mind, then you can testify tomorrow at 9:00.

(DE85:157-160). The next morning, Mr. Odely's attorney informed the court that his client "has changed his mind and does not now desire to testify", to which the court responded:

[COURT]: Mr. Odely, have you had enough time to think about this and talk about it with your lawyer?

[ODELY]: Yes, sir, Your Honor.

[COURT]: And is it your decision not to testify, is that correct?

[ODELY]: Yes, sir, Your Honor.

[COURT]: Okay.

(DE88:3).

Mr. Odely did not present any other evidence in his defense.

### d. Closing arguments.

In closing arguments, the government maintained that Mr. Odely had used all three alleged means—force, threats of force, *and* coercion—in violating the "force" subsection of § 1591(a)(1). (DE88:9-111). Citing supporting evidence, the government highlighted how Mr. Odely helped D.M.C. to rob several customers. (DE88:11). Consistent with the jury instructions, the government also argued that "[m]inors lack the capacity to consent to unlawful sexual conduct. That's the law." (DE88:33) (arguing "[i]t's not a minor's choice"). Consistent with the special verdict form (DE27), the government never mentioned any *mens rea* as to the " force" subsection. (DE88:7-9).

Mr. Odely's closing argument focused on the weakness of the government's case as to the "force" subsection. (DE88:17, 19-21, 24-27). His attorney also reassured the jury that if they "want certain things read back to [them], we can do that." (DE88:24).

### e. Jury instructions.

The district court adopted the government's modified [6] offense

---

[6] *Compare* Eleventh Circuit Pattern Jury Instructions (Criminal),

instruction in full, without objection. (DE85:163). It provided, in

pertinent part:

> The indictment charges [that] the defendant knowingly engaged in commercial sex trafficking . . .
>
> It's a federal crime for anyone in or affecting commerce to recruit, entice, harbor, transport, provide, obtain, maintain or solicit by any means a person knowing and in reckless disregard of the fact, or having had a reasonable opportunity to observe the minor victim by [sic] means of force, threats of force or coercion will be used to cause the person to engage in a commercial sex act, and the person has not attained the 18 years and will be caused to engage in a commercial sex act.
>
> The defendant can be found guilty of this crime, only if all the following facts are proved beyond a reasonable doubt.
>
> One, the defendant knowingly recruited, enticed, harbored, transported, provided, obtained, maintained or solicited by any means, the minor victim.
>
> Two, that the defendant did so knowing in reckless disregard of the fact, or having had a reasonable opportunity to observe the minor victim, that means of force, threats of force, coercion, or other combination of such means would be used to cause the person to engage in a commercial sex act and the person had not attained the age of 18 years and would be caused to engage in a commercial sex act.

---

Offense Instruction No. O63, *with* DE21:12-15 (modifying pattern by adding: a "reasonable opportunity to observe" *mens rea* as to both "force" and "minor" subsections; a lack of scienter requirement as to interstate commerce; and a minor's inability to legally consent to commercial sex).

And three, that the defendant's -- that the defendant's acts were in or affected interstate or foreign commerce.

Commercial sex act means any sex act on account of which of anything value is given to or received by any person.

In determining whether the defendant's conduct was in or affected interstate or foreign commerce, you may consider whether the defendant used means or facilities of interstate commerce such as telephones, the Internet, or hotels that service interstate travelers, or whether his conduct substantially affected interstate commerce by virtue of the fact that he purchased items that had moved in interstate commerce.

You are further instructed that the Government need not prove that the defendant knew his conduct involved the use of any facilities of interstate commerce, and hence, occurred in interstate commerce or that he knew that the conduct would affect interstate commerce.

It is sufficient for the Government to prove that the defendant's conduct did, in fact, occur in interstate commerce or that the natural consequences of the defendant's conduct would affect interstate commerce.

If the Government proves beyond a reasonable doubt that the defendant had a reasonable opportunity to observe a person, recruited and enticed, harbored, transported, provided, obtained or maintained, then the Government does not have to prove that the defendant knew that the person had not attained the age of 18 years.

Coercion means threats of serious harm to or physical restraint against any person or any scheme, plan or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint

against any person, or the abuse or threatened abuse of law or the legal process, whether administrative, civil or criminal in any manner or for any purpose for which the law was not designed in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

Serious harm means any harm, whether physical or non-physical, including psychological, financial, or reputational harm that is sufficiently serious under all the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances to perform or t continue performing commercial sexual activity in order to avoid incurring that harm.

You are further instructed as a matter of law that minors lack the capacity to consent to unlawful sexual conduct. Therefore, whether the alleged minor involved in this case voluntarily agreed to engage in commercial sex acts has no bearing on the issue of whether the defendant is guilty of sex trafficking a minor.

(DE88:39-42).

### f. Jury deliberations and verdict.

Upon beginning to deliberate, the jury asked the Court Security Officer how the jury could play Mr. Odely's videotaped statement. (DE88:49). Next, the jury requested to re-read the transcript of Mr. Odely's statement. (DE88:49-51; DE29). Mr. Odely's attorney maintained his objection to that transcript, and the district court agreed not to provide it to the jury again. (DE88:50). Instead, the district court

instructed the jury that: "Although the transcript was identified as exhibit 16, it was actually a demonstrative exhibit, and, as such, does not go back to the jury." (DE29).

The jury subsequently reported that "the volume on the computer is very, very poor – what can be done?" (DE29). They were given speakers for the computer. (DE88:51, 55).

Finally, the jury requested "a transcript of the testimony given." (DE29). While discussing this note, outside of the presence of the jury, the district court stated that it did not want to transcribe the entire trial, because it would take too long. (DE88:53-57). Mr. Odely and his attorney requested that the district court follow up with the jury to determine, specifically, what testimony the jury wanted transcribed. (DE88:52-54, 56-57). The prosecutor conceded that the note was "so vague, I don't know what they want a transcript of," but nonetheless objected to the defense request. (DE88:54). The district court refused the defense request, instead instructing the jury that:

> You can't just push a button to get the transcript. It takes quite a bit of time to prepare transcripts, so I'm going to ask that you rely on your collective recollection of what the testimony was.

(DE88:55). The district court—also outside the presence of the jury—

stated that, if the jury submitted yet another question, requesting a specific transcript, it would honor that request. (DE88:53, 56-57).

After deliberating for a total of six hours, the jury returned a guilty verdict. (DE88:45, 58; DE27).

## III. Standards of Review

"The district court's subject matter jurisdiction is a question of law that [the Court must] review *de novo* even when it is raised for the first time on appeal." *United States v. Iguaran*, 821 F.3d 1335, 1336 (11th Cir. 2016).

Preserved errors are generally subject to one of two types of harmless error analysis. *See United States v. Pon*, 963 F.3d 1207, 1227 (11th Cir. 2020). "A constitutional error is harmless if the government proves beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (internal quotation omitted). "A nonconstitutional error, on the other hand, is harmless unless it resulted in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (internal quotation omitted). It is the government's burden to establish harmlessness as to these errors as well. *Id.*

The district court's response to jury questions is reviewed for an abuse of discretion *See United States v. Pacchioli,* 718 F.3d 1294, 1306 (2013).

As to a claim of cumulative trial error, the Court "review[s] the

prejudicial effect of all evidentiary errors, evaluated under both preserved and plain error standards, in the aggregate," and will reverse "if the cumulative effect of the errors is prejudicial, even if the prejudice caused by each individual error was harmless." *United States v. Baker*, 432 F.3d 1189, 1203 (11th Cir. 2005), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813, 821 (2006) (citations omitted).

## SUMMARY OF THE ARGUMENT

Mr. Odely's conviction for sex trafficking of a minor by force or coercion, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), & (b)(2), must be vacated due to five errors.

First, the indictment alleged that Mr. Odely violated the "force" subsection of § 1591(a)(1) with the improper *mens rea* of "having had a reasonable opportunity to observe the victim." The indictment thus affirmatively alleged conduct—having a "reasonable opportunity to observe" that force or coercion would be used to cause the victim to engage in commercial sex—that is not an offense against the laws of the United States. The jury instructions repeated this error. The special verdict form went further: constructively amending the indictment to erase <u>any</u> *mens rea* as to the "force" subsection, and broadening the purpose of force or coercion, from "to cause the victim to engage in commercial sex," as the statute requires, to "to commit the offense," generally. Combining the indictment, jury instructions, and special verdict form, Mr. Odely was convicted of a non-offense, and the district court lacked jurisdiction to convict and sentence him.

Second, over objection, the government's case agent testified that

the victim had previously given a statement that was consistent with the entirety her testimony. However, neither the district court, nor the jury, was provided with the victim's actual prior statement. This testimony therefore violated the rule against hearsay, and invaded the province of both the district court and the jury. Given the importance of the victim's testimony (and credibility) to the government's case, this error was not harmless.

Third, the jury was erroneously informed that Mr. Odely had recently finished a nine-year prison sentence. This information was irrelevant, and substantially prejudicial. Yet the district court never told the jury to disregard it in determining Mr. Odely's guilt. The unmitigated admission of damaging propensity evidence was not harmless.

Fourth, the district court interfered with Mr. Odely's right to testify by responding to his stated desire to testify with advice that he should consider the "strategic" concern that the jury would only learn that he was a convicted felon if he chose to testify—advice that was improper, incorrect, and appeared to influence Mr. Odely, who ultimately did not testify. Given the absence of a counter-narrative as to the "force" subsection violation, and the lack of mitigation regarding his prior

sentence, the government cannot prove that this constitutional error was harmless beyond a reasonable doubt.

Finally, by issuing a blanket denial to the jury's second request for transcripts from the trial, the district court abused its discretion. The court's decision undermined the credibility of Mr. Odely's attorney, who had promised that the jury would be able to have portions of the trial read back to them. Especially because Mr. Odely did not present a defense case, the credibility of his attorney was critical to establishing reasonable doubt; the district court's decision undermined that credibility, thereby prejudicing Mr. Odely.

Each of these errors independently merits reversal of Mr. Odely's § 1591(a)(1) conviction. Even if that were not the case, their combined effect deprived Mr. Odely of his fundamental right to a fair trial, requiring reversal under the cumulative error doctrine.

## ARGUMENT AND CITATIONS OF AUTHORITY

**I.  Mr. Odely was convicted of the non-offense of "using force, threats of force, or coercion to commit the offense," under a strict-liability theory**.

An indictment that fails to charge a crime in violation of the laws of the United States constitutes a jurisdictional defect that can be raised at any time. *United States Izurieta*, 710 F.3d 1176, 1179-1185 (11th Cir. 2013). Further, "[an impermissible] constructive amendment to an indictment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *United States v. Keller*, 916 F.2d 628, 634 (11th Cir. 1990).

Both of these errors occurred in Mr. Odely's case, and resulted in his conviction for the non-offense *and* the unindicted offense of "using force, threats of force, or coercion to commit the offense" of sex trafficking, under a strict liability theory. However, the statute requires at least reckless disregard as to the use of force, and, furthermore, the statute requires that force or coercion be used to cause the victim to engage in commercial sex, not generally to further the offense. 18 U.S.C. § 1591(a)(1).

Mr. Odely's § 1591(a)(1) conviction must therefore be vacated.

**a. The indictment affirmatively alleged a non-offense.**

Section 1591(a)(1) outlines two offenses.

First, § 1591(a) makes it a federal crime to sex traffic an individual knowing, or in reckless disregard of, the fact that force, threats of force, fraud, coercion, or any combination of those, "will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a). (The "force" subsection). A 15-year mandatory minimum applies to a violation of the "force" subsection of § 1591(a). 18 U.S.C. § 1591(b)(1).

Second, §1591(a) makes it a federal crime to sex traffic an individual knowing, or in reckless disregard for, the fact "that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a). (the "minor" subsection). If the victim is older than 14 years' old, this offense has a 10-year mandatory minimum. 18 U.S.C. § 1591(b)(2).

Title 18 U.S.C. § 1591(c) further allows the government to avoid having to prove knowledge, or reckless disregard, *as to the victim's age*, if the defendant had a "reasonable opportunity to observe" the victim. *United States v. Whyte*, 928 F.3d 1317, 1330 (11th Cir. 2019) (interpreting

§ 1591(c) to mean that "[p]roof that a defendant had a 'reasonable opportunity to observe' the victim relieves the government of its burden of proving that the defendant either knew or recklessly disregarded the victim's age"). This *mens rea* exception applies only to the "minor" subsection; it does not apply to the "force" subsection of § 1591(a). 18 U.S.C. § 1591(c).

The government attempted to charge Mr. Odely by indictment with both types of offenses under §1591(a), in a single count, as follows:

> The Grand Jury charges that:
>
> From on or about January 24, 2022, and continuing until on or about April 26, 2022, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,
>
> **DARRYL ODELY JR.,**
>
> did knowingly, in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide, obtain, maintain, and solicit by any means a person, that is, MINOR VICTIM, knowing, in reckless disregard of the fact, and having had a reasonable opportunity to observe MINOR VICTIM, that means of force, threats of force, and coercion, and any combination of such means, would be used to cause MINOR VICTIM to engage in a commercial sex act, and MINOR VICTIM had not attained the age of 18 years and would be caused to engage in a commercial sex act, in violation of Title 18, United States Code, Sections 1591(a)(1), (b)(1), (b)(2), and (c), and 2.

(DE1) (emphasis added). By including three different *mens rea*— knowing, in reckless disregard of the fact, and having had a reasonable opportunity to observe minor victim—as to *both* violations of § 1591(a),

37

the indictment alleged conduct that is not a violation of the laws of the United States. That is, it alleged that Mr. Odely violated the "force" subsection of § 1591(a) with the mental state of "having had a reasonable opportunity to observe," that means of force, threats of force, and coercion would be used to cause the victim to engage in a commercial sex act. *Id*. This allegation is not a federal offense, and its inclusion in the indictment stripped the district court of jurisdiction to convict and sentence Mr. Odely for a violation of the "force" subsection of § 1591(a). *See Izurieta*, 710 F.3d at 1185.

> **b. The special verdict form constructively amended the indictment and confirms that Mr. Odely was convicted of a non-offense.**

The jury instructions and the special verdict form confirm that Mr. Odely was convicted of a non-offense—albeit, a different non-offense than the one he was indicted for, because the special verdict form constructively amended the indictment.

A constructive amendment runs afoul of both the Fifth Amendment's grand jury right, and the Sixth Amendment's notice requirements. *Keller*, 916 F.2d at 633. *Accord United States v. Farr*, 536 F.3d 1174, 1184 (10th Cir. 2008) ("As the dual source of the rule [against

constructive amendment] makes clear, it protects *both* a defendant's right to be subjected only to charges set by a grand jury and his interests in having sufficient notice.") (internal citation omitted).

Again, the indictment at issue alleged three possible *mens rea* for both the "force" and "minor" subsection violations: knowing, reckless disregard, or a reasonable opportunity to observe. (DE1). And, again, "a reasonable opportunity to observe" is *not* a permissible *mens rea* for the "force" subsection of § 1591(a).

Rather than clarify the indictment's erroneous *mens rea*, however, the jury instructions compounded, and expounded on, the confusion that error created. The district court instructed the jury, in relevant part, that:

> The indictment charges [that] the defendant knowingly engaged in commercial sex trafficking . . .
>
> It's a federal crime for anyone in or affecting commerce to recruit, entice, harbor, transport, provide, obtain, maintain or solicit by any means a person knowing and in reckless disregard of the fact, or having had a reasonable opportunity to observe the minor victim by [sic] means of force, threats of force or coercion will be used to cause the person to engage in a commercial sex act, and the person has not attained the 18 years and will be caused to engage in a commercial sex act.
>
> The defendant can be found guilty of this crime, only if all the following facts are proved beyond a reasonable doubt.

One, the defendant knowingly recruited, enticed, harbored, transported, provided, obtained, maintained or solicited by any means, the minor victim.

<u>Two, that the defendant did so knowing in reckless disregard of the fact, or having had a reasonable opportunity to observe the minor victim, that means of force, threats of force, coercion, or other combination of such means would be used to cause the person to engage in a commercial sex act</u> and the person had not attained the age of 18 years and would be caused to engage in a commercial sex act.
. . .

If the Government proves beyond a reasonable doubt that the defendant had a reasonable opportunity to observe a person, recruited and enticed, harbored, transported, provided, obtained or maintained, then the Government does not have to prove that the defendant knew that the person had not attained the age of 18 years.

(DE88: 39-42) (emphasis added).

The instructions thus twice repeated the error that "having had a reasonable opportunity to observe" was a mental state that the jury could rely on to convict Mr. Odely of violating the "force" subsection of § 1591(a)(1).

Meanwhile, the special verdict form provided:

## VERDICT FORM

We, the Jury in the above-captioned case, unanimously find:

As to the sole count of the Indictment, which charges Defendant **DARRYL ODELY JR.** with comercial sex trafficking:

GUILTY    X        NOT GUILTY  _____

If you find the Defendant GUILTY, did you unanimously find that the Defendant **DARRYL ODELY JR.**:

  (a) used means of force, threats of force, or coercion to commit the crime?

      YES _____X_____        NO _____

  (b) knew, acted in reckless disregard of the fact that the Minor Victim was under the age of 18 years, or had a reasonable opportunity to observe the Minor Victim?

      YES _____X_____        NO _____

(DE27). In response to "the sole count of the Indictment, which charges Defendant Darryl Odely Jr. with commercial sex trafficking," the jury selected "GUILTY." *Id*. The jury next found that Mr. Odely, "used means of force, threats of force, or coercion to commit the crime." *Id*. Finally, the jury found that the Mr. Odely "knew, acted in reckless disregard of the fact that the Minor Victim was under the age of 18 years, or had a reasonable opportunity to observe the victim." *Id*.

Consider, in comparison, the completed special verdict form from

another case in which the defendant was also charged with both types of § 1591(a) violation, in a single count:



*United States v. Walker*, 73 F.4th 915, 928–29 (11th Cir. 2023). Again, the statute requires that the defendant know, or recklessly disregard the fact, that force, threats of force, or coercion would be used to cause the victim to engage in a commercial sex act. 18 U.S.C. § 1591(a). The *Walker* verdict form tracks the wording of the statute (and presumably Mr. Walker's indictment).

Mr. Odely's verdict form, in contrast, does not track the statute. (DE27). Nor does it track his indictment, or the jury instructions, which, as mentioned, each (erroneously) included "a reasonable opportunity to observe the minor victim" as a *mens rea* as to the "force" subsection

charge. (DE1; DE88:39-42). However, Mr. Odely's special verdict form: (i) removed <u>any</u> *mens rea* element as to the use of force or coercion, and (ii) permitted a conviction where force or coercion were used "to commit the crime," generally—as opposed to specifically "to cause the victim to engage in a commercial sex act." (DE27). Mr. Odely's verdict form thus "broaden[ed] the possible bases for conviction beyond what [wa]s contained in the indictment," in two ways, creating an impermissible amendment. *See Keller*, 916 F.2d at 634.

### c. While no showing of prejudice is required, Mr. Odely was substantially prejudiced.

No showing of prejudice is required to vacate Mr. Odely's conviction. The indictment affirmatively alleged a non-offense by including the wrong *mens rea* as to the force subsection of § 1591(a). Further, by removing any *mens rea* element as to that subsection, and allowing a conviction where force was not necessarily used to cause the victim to engage in sex trafficking, the special verdict form both constructively amended the indictment, *and* affirmatively alleged a (separate) non-offense from the indictment. Thus, neither the indictment, nor the jury instructions, nor the special verdict form, tracked the language of the "force" subsection of § 1591(a), and the district court

lacked jurisdiction to convict and sentence Mr. Odely for violating that section of the statute. *See Izurieta*, 710 F.3d at 1179.[7]

These errors did, nonetheless, substantially prejudice Mr. Odely.

The trial evidence supports at least two theories upon which the jury could have relied to find that Mr. Odely "used force" "to commit the offense," *without* requiring the jury to also find that Mr. Odely *knew or recklessly disregarded* that force would be used *to cause the victim to engage in commercial sex trafficking.*

First, there was undisputed evidence that Mr. Odely helped D.M.C. to rob several of her "customers." (DE85:31-35). The government raised these robberies during its discussion of the evidence supporting Mr. Odely's conviction for violating the "force" subsection. (DE88:11). The jury thus could have relied on Mr. Odely's involvement in these robberies to convict him of "using means of force, threats of force, or coercion to commit the crime"—even though the robberies did not cause D.M.C. to engage in commercial sex trafficking, and presumably involved using

---

[7] The government's opening and closing arguments tracked the absence of *mens rea* in the special verdict form. (DE84:175; DE88:7-9).

force only against her "customers."[8]

Second, D.M.C. alleged that Mr. Odely was "mostly" violent with her in response to their disputes about his other relationship. (DE85:108). But the government still relied on this testimony to support its theory that Mr. Odely's "used force" and "threats of force" as alleged in the indictment. (DE88:9-11). Given that the special verdict form permitted a conviction where Mr. Odely "used force," "to commit the offense," generally, the jury could have relied on this evidence, and argument, to convict him of violating the "force" subsection of 1591(a)(1)—without ever finding beyond a reasonable doubt that he knew or recklessly disregarded that such force "caused the victim to perform commercial sex," as the statute requires.

The broadening of multiple elements of the "force" subsection offense is also troubling when considered along with the risk posed by the instruction that minors cannot lawfully consent to commercial sex. *See* DE88:42. While this is a correct statement of the law, when it is used— as it was here—to counter a defense argument that the defendant did not

---

[8] Force was not defined for the jury.

"force" or "coerce" a minor to commit sex trafficking (DE88:15), the jury could conclude that, legally, a defendant who is guilty of sex trafficking a minor *must necessarily also* be guilty of trafficking that minor by "force" or "coercion"—since the minor cannot consent. Given the lack of precision in the indictment, instructions, and verdict form, as to the "force" subsection elements, Mr. Odely's jury could have convicted him on this improper basis, as well.

The jury was never correctly instructed as to the elements of a "force" subsection offense. The government's evidence as to the "force" subsection was not overwhelming, and Mr. Odely's defense accordingly rested heavily on the insufficiency of the government's proof that Mr. Odely used force, threats of force, or coercion to cause D.M.C. to engage in commercial sex acts. (DE88:17, 19-21, 24-27). *See also* DE85:157 (Mr. Odely's Rule 29 argument); DE33 (Mr. Odely's motion for a new trial, alleging insufficient evidence as to "force" subsection). Had the indictment, the instructions and the special verdict form correctly stated the law, it is reasonably probable that the jury would have acquitted Mr. Odely as to the "force" subsection of § 1591(a). Had he been acquitted, a 10-year, rather than a 15-year, mandatory minimum would have applied.

18 U.S.C. § 1591(b). Therefore, his conviction must be vacated.

## II. The district court erred by allowing the case agent to offer a harmful opinion based on hearsay.

Immediately after D.M.C. testified, the government called its last witness—the case agent—to the witness stand. (DE85:118). The case agent testified that she had spoken to the D.M.C., multiple times, prior to D.M.C.'s testimony. (DE85:120-22). The case agent said D.M.C. was "uncooperative," and "unwilling to talk," during the first two interviews. (DE85:120-21). Then, the government inquired, "and then a third time, did you have another opportunity to speak with the victim?":

> [CASE AGENT]  I did . . . towards on or about like the end of July, and that was in Orlando.
>
> [GOVERNMENT]  So, that was several months later?
>
> [CASE AGENT]  Several months later.
>
> [GOVERNMENT]  And was she more cooperative at this point?
>
> [CASE AGENT]  Yes, she was.
>
> [GOVERNMENT]  And did she tell you basically what she told you on the stand today?
>
> [CASE AGENT]  She did.

(DE85:121-22). Mr. Odely objected regarding this last question and answer, on the basis of "hearsay and speculation without going into specifics." (DE85:122). The district court overruled the objection, stating "I'll allow it as a prior consistent statement." (DE85:122). The agent then repeated, "She did." (DE85:122).

Rule 801(d) provides that a declarant's prior statement is not hearsay if:

> The declarant testifies and is subject to cross-examination about a prior statement, and the statement:
> …
> **(B)** is consistent with the declarant's testimony and is offered:
>
> > **(i)** to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or
> >
> > **(ii)** to rehabilitate the declarant's credibility as a witness when attacked on another ground[.]

Fed. R. Evid. 801(d)(1).

The case agent's affirmative answer to the government's leading question whether D.M.C. had told the agent "basically what [D.M.C.] told [the jury] on the stand," was not a prior consistent statement. *See id*. The content of D.M.C.'s alleged prior consistent statement was not proffered or entered into evidence. Had the government proffered the D.M.C.'s

alleged prior statement as a "prior consistent statement" under Rule 801(d)(1)(B), it would have been up to the district court—not the government, or its agent—to determine whether that statement was "consistent," made before a motive to fabricate, and otherwise satisfied the Rule. *See id.*; *United States v. Drury*, 396 F.3d 1303, 1317 (11th Cir. 2005); *United States v. Manati*, 697 F. App'x 683, 687 (11th Cir. 2017) ("[W]hether a witness had a motive to fabricate when prior consistent statements were made is plainly a question of fact to be resolved by the trial court[.]").

Moreover, had the district court determined that the content of the victim's prior statement was admissible under Rule 801(d)(1)(B), and had the statement itself been admitted, the jury would have been able to evaluate whether the case agent's opinion—that D.M.C.'s prior consistent statement was "basically" the same as her testimony—was accurate. *See United States v. Rivera*, 780 F.3d 1084, 1094 (11th Cir. 2015) "(Where a witness's testimony is based upon her 'perceptions of the conversation[,] . . . the accuracy of those perceptions [is] a question for the jury."). However, without knowing the content of the prior statement, the jury was unable to determine the accuracy of the agent's perception.

*See United States v. Brown*, 548 F.2d 1194, 1205 (5th Cir. 1977) (finding reversible error where "the jury had no way to examine the trustworthiness of [the agent]'s testimony, because it could not examine the statements of the declarant[] or others on which [the agent]'s testimony was directly and substantially founded").[9]

Because the government never proffered D.M.C's prior statement for the district court to determine whether it satisfied Rule 801(d)(1)(B), it remained a hearsay statement. Fed. R. Evid. 801(c) (defining hearsay as an out of court statement offered to prove the truth of the matter asserted). The agent's opinion that that D.M.C.'s prior statement was "basically the same" as her testimony thus not only invaded the province of both the court, and the jury, but it was also based on inadmissible hearsay.

The erroneous admission of the agent's opinion that D.M.C.'s prior statement was consistent with the entirety of her testimony was not harmless. The jury was told—by the government, its agent, and the

---

[9] *See Bonner v. City of Prichard, Ala.*, 661 F.3d 1206, 1207 (11th Cir. 1981) (incorporating Fifth Circuit decisions prior to October 1, 1981 as binding Eleventh Circuit precedent).

judge—that the victim had given a prior consistent statement that was "basically the same" as her testimony. (DE85:122). Because the substance of the statement was never proffered, nor entered into evidence, the jury could not decide for themselves whether, in fact, that prior statement was "consistent," with D.M.C.'s testimony.[10]

Key aspects of D.M.C.'s testimony were contradicted—or otherwise uncorroborated—by other evidence. For example, contrary to D.M.C.'s claim at trial that she had tried to run away from Mr. Odely, but he had chased her down (DE85:37), the text messages between them show that Mr. Odely repeatedly asked D.M.C. to leave. (DE40-12:32-37). Notwithstanding D.M.C.'s claim at trial that Mr. Odely had been violent with her "a majority of the time" (DE85:37), the agents that questioned Mr. Odely in August 2022—*after* the victim had begun cooperating with authorities (DE85:121-122)—never asked him whether he was violent toward her. (DE92-1; Gov't Ex. 15). In fact, they reassured him that they did not believe that he was. (DE92-1:26). D.M.C. also initially made a statement exculpating Mr. Odely. (DE85:107-08).

---

[10] This Court is also unable to determine whether D.M.C.'s alleged prior statement was consistent with her testimony.

D.M.C., further, had motives to exaggerate Mr. Odely's culpability. She was admittedly upset with Mr. Odely over his relationship with another woman, who Mr. Odely was apparently still dating at the time his trial. (DE85:108-09). After he spent Valentine's Day with this other woman, D.M.C. even warned him, "hoe u gonna regret being with me." (DE85:108-09; DE40-12:13). She was also a minor, who had run away from home, while on juvenile probation for battery on a law enforcement officer (DE85:56-58); who admitted to using drugs, and engaging in sex work, prior to meeting Mr. Odely (DE85:59-91, 95); who admitted to "robbing" multiple "customers" before, and during, her time with Mr. Odely (DE85:33-34; 115-116); who had been questioned numerous times by law enforcement, after she was first found with Mr. Odely (DE85:107, 120-22); and she had received a plea deal, prior to her testimony, to resolve her violation of probation. (DE84:214, 243; DE85:3-4). These factors—along with her youth—likely led the victim to believe that she could face negative legal and reputational consequences if her testimony at trial contradicted or undermined the government's theory. *See generally United States v. Hands*, 184 F.3d 1322, 1331 (11th Cir.), *corrected,* 194 F.3d 1186 (11th Cir. 1999) ("When we assess the strength

of the government's case for purposes of harmless error analysis[] we may take into account factors—such as incentives to lie—that would have affected the jury's assessment of a witness's testimony."). Under these circumstances, the government cannot prove that informing the jury that the victim had given a prior statement which was "basically what she told [the jury] on the [witness] stand"—and without providing the actual substance of that statement—was harmless. *See United States v. Pon*, 963 F.3d 1207, 1227 (11th Cir. 2020) (observing that the government bears the burden to establish harmlessness of preserved errors).

### III. The district court erred by admitting, and then failing to mitigate, the transcript's reference to Mr. Odely's prior sentence.

Federal courts have long recognized that evidence of a defendant's prior convictions is patently prejudicial because juries view such evidence as proof of the defendant's propensity to commit more crime. *See, e.g., Old Chief v. United States,* 519 U.S. 172, 181 (1997) (explaining that such propensity evidence "'is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge'") (quoting *Michelson v. United States,* 335 U.S. 469, 476 (1948)).

In light of the "patently prejudicial" nature of prior conviction evidence, Mr. Odely asked the government to redact references to his prior sentence from his statement to the FBI. (DE84:4-5). The government agreed. *Id*.

Mr. Odely ultimately objected to showing the jury even the redacted version of transcript. (DE85:124-26). The court overruled Mr. Odely's objection, and both the redacted video-taped statement, and the redacted transcript, were admitted and published to the jury. (DE85:126-28). The district court instructed the jury that the transcript was "admitted . . . for the limited and secondary purposes of helping you follow the" tape, and "to help you identify the speakers." (DE85:127). The court also instructed the jury to ignore the redacted portions. (DE85:127).

After the jury was shown the videotape and the transcript, the district court observed that the redacted transcript still contained Mr. Odely's unreduced statement that he "did nine years," on page 31. (DE85:129). More specifically, the "redacted" transcript provided that Mr. Odely told the FBI: "Before all I got out man I was working and some mo' stuff, I ain't get out of those and into no sex trafficking . . . I got out working. Did nine years, man." *See* DE92-1:31.

In response to this error, the court did not provide the transcript to the jury during its deliberations. (DE85:130). However, the district court did not strike the evidence of Mr. Odely's prior prison sentence from the record, or otherwise instruct the jury not to consider his criminal history in determining his guilt. Moreover, the transcript contained *additional* references to Mr. Odely's release from prison. DE92-1: 24, 32, 44

The jury's actions during deliberations show that the court's optimism—that the jury might have missed prejudicial information in Mr. Odely's statement—was misplaced. Upon beginning to deliberate, the jury asked the Court Security Officer how the jury could play Mr. Odely's videotaped statement. (DE88:49). Next, the jury requested to re-read the transcript of Mr. Odely's statement (DE88:49-51; DE29). When that request was denied, *id.*, the jury next asked for—and received—help with hearing the videotape of his statement. (DE88:51-55; DE29). Thus, the jury appeared to be singularly focused on Mr. Odely's statement, and the Court should assume that they were aware of Mr. Odely's prior prison sentence, which was referenced therein.

Mr. Odely's prior prison sentence was not only patently prejudicial,

but it also lacked probative value. Its admission therefore violated Federal Rules of Evidence 402, and 403. Further, evidence of Mr. Odely's prior conviction and sentence was not noticed by the government, or relevant to prove any exceptions, as would be required for its admission under Rule 404(b). The district court therefore erred by admitting and or showing the jury the partially redacted transcript of Mr. Odely's statement to the FBI.

Because no mitigating or limiting instruction was given, the jury was free to use this information in the way that most laypersons would: as evidence of Mr. Odely's bad character, and of his guilt as to the instant offense. *See Old Chief,* 519 U.S. at 181; *United States v. Pritchard*, 973 F.2d 905, 908 (11th Cir. 1992) (acknowledging that, even *with* a limiting instruction, it is difficult for juries not to draw propensity inferences from prior convictions). Moreover, the admissible evidence of Mr. Odely's guilt—particularly as to the "force" subsection of § 1591(a)—was not overwhelming. Thus, the government cannot prove that the erroneous admission of multiple references to Mr. Odely's recent release from a significant prison sentence, combined with the absence of a mitigating instruction, was harmless, and Mr. Odely's conviction must be vacated.

## IV. The district court violated Mr. Odely's right to testify.

Defendants have "a fundamental constitutional right to choose whether to testify in [their] own defense." *United States v. Anderson*, 1 F.4th 1244, 1253 (11th Cir. 2021) (internal citations omitted). However, "the court generally should not probe a defendant's reasoning as to whether or not to testify," because doing so, "runs the risk of denying a defendant's right to testify[.]" *Id.* at 1255 (quoting *United States v. Ly*, 646 F.3d 1307, 1318 (11th Cir. 2011)). If the court does conduct an inquiry with the defendant about testifying:

> [the district court] should avoid questions that probe trial-strategy issues or suggest the court's own opinion as to what choice the defendant should make—questions that might disturb the attorney-client relationship, undermine the defendant's ability to make a knowing and intelligent decision, or overpower the defendant's will.

*Anderson,* 1 F.4th at 1259. *See also Ly*, 646 F.3d at 1313 (identifying similar risks of inquiry); *United States v. Teague*, 953 F.2d 1525, 1533 n.8 (11th Cir. 1992) (en banc) (warning that court's inquiry could "unnecessarily intrude into the attorney-client relationship and could unintentionally influence the defendant in his or her choice").

Here, the district court's lengthy colloquy improperly raised a strategic trial issue—informing the jury as to the defendant's prior convictions—in a way that mischaracterized the evidence, implied that Mr. Odely should not testify, and improperly interfered with the attorney-client relationship. Thus, Mr. Odely's right to testify was denied. *See id.*

After the government rested, Mr. Odely told the court that he intended to testify. In response, with defense counsel's consent, the district court conducted the following colloquy:

> THE COURT: Mr. Odely, you understand you have a constitutional right to testify?
>
> THE DEFENDANT: I do, Your Honor.
>
> THE COURT: Do you understand you have a constitutional right not to testify?
>
> THE DEFENDANT: I do, Your Honor.
>
> THE COURT: Your lawyers been to law school. He's tried a lot of cases. He gives the benefit of his legal advice but it's your life, you don't have to follow the advice. Do you understand that?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: There may be strategies reasons for or against you're testifying. Do you understand that?

THE DEFENDANT: Say that again, Your Honor.

THE COURT: There may be strategic reasons for or against your testifying. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Right now, the jury doesn't know whether you're a convicted felon. If you take the stand and testify, the Government may be able to bring out that you have prior felony convictions if you do. Do you understand that?

THE DEFENDANT: At this point, I'm fighting for my life. I have nothing to hide, sir.

THE COURT: But that may be a strategy reason for or against your testifying. Do you understand that?

THE DEFENDANT: Understood, sir.

. . .

THE COURT: So again, whatever decision you make, it's your decision. You know you can listen to your lawyer's advice but it's your life. It's up to you to decide what you want to do. Do you understand that?

THE COURT: And have you had enough time to think about this and talk about it with your lawyer?

THE DEFENDANT: Yes, I did, sir.

THE COURT: And is it your decision that you do or do not want to testify, or is it something you want to think about overnight? You have that right, too. You can think about it.

MR. LEWIS: Judge, in helping in that decision, I'd ask the Government previously asking again if they have the number

of felony convictions, that they would use to impeach with so I can give him that number?

MS. KOONTZ: We have certified convictions. Felony convictions. He spent nine years in prison.

MR. LEWIS: So the number would be three.

THE DEFENDANT: I want to testify.
. . .

THE COURT: All right. And obviously, I sent the jury home so you can do that first thing tomorrow morning at 9:00. If you change your mind, you can change your mind but if you don't change your mind, then you can testify tomorrow at 9:00.

(DE85:157-160) (emphasis added).

Mr. Odely's status as a convicted felon was the only explicit "strategic reason[] for or against testifying," discussed by the district court (and echoed by counsel) during this lengthy colloquy. The district court's decision to discuss only this "strategic" concern suggested that Mr. Odely's status as a convicted felon was an especially important consideration—and one that impliedly weighed against testifying. Moreover, by responding to Mr. Odely's repeated insistence that he wanted to testify with an elaborate colloquy, including twice advising Mr. Odely that he could "think about [it] overnight," and "[could] change [his] mind," the judge further implied that testifying was imprudent.

60

Intentionally or not, the district court placed its thumb on the scale against Mr. Odely testifying.

The judge also took on the role of an attorney in advising Mr. Odely to consider the "strategic" concern of his convicted felon status, while emphasizing that Mr. Odely did not have to accept his lawyer's advice—which, while true, under the circumstances, supplanted Mr. Odely's attorney with the judge.

The court's approach therefore both undermined Mr. Odely's ability to make a voluntary decision whether to testify, and interfered with the attorney-client relationship. Worse still, however, the district court's statement that the jury did not already know that Mr. Odely was a convicted felon was misleading, at best. As mentioned above, through Mr. Odely's statement to the FBI, the jury had already been provided with information upon which it could infer that Mr. Odely was a convicted felon. *See* Gov't Ex. 15; DE92-1 (Gov't "True" Ex. 16). *Cf. United States v. Innocent*, 977 F.3d 1077, 1083 (11th Cir. 2020) (observing that the Court has repeatedly held that serving over a year in prison provides circumstantial evidence of knowledge of felon status). By telling Mr. Odely that the jury would only learn that he was a convicted felon if he

chose to testify—when in fact the jury had heard evidence that Mr. Odely had recently been released from a nine-year prison sentence—the judge deprived Mr. Odely of a knowing and intelligent choice about whether to exercise his right to testify.

In light of the district court's approach, it is unsurprising that Mr. Odely ultimately did not testify. The morning after the district court's inquiry, Mr. Odely's attorney informed the court that his client had decided not to testify. (DE85:3). The district court responded succinctly:

> [COURT]: Mr. Odely, have you had enough time to think about this and talk about it with your lawyer?
>
> [ODELY]: Yes, sir, Your Honor.
>
> [COURT]: And is it your decision not to testify, is that correct?
>
> [ODELY]: Yes, sir, Your Honor.
>
> [COURT]: Okay.

(DE85:3). The brevity of the court's colloquy in response to Mr. Odely's decision *not* to testify, compared to its lengthy inquiry in response to Mr. Odely's desire *to* testify, fortified the impression that the judge believed that Mr. Odely should not testify. Since he ultimately opted not to testify, it appears that Mr. Odely's decision not to testify was influenced by the district court.

The government cannot prove that this improper influence was harmless beyond a reasonable doubt. Although Mr. Odely's statement to the FBI contains his adamant denials that he was aware of the victim's true age, or that he caused her to engage in sex trafficking, the agents interviewing him reassured him that they did not believe he forced the victim to be a prostitute. (Gov't Ex. 15; DE91-2:26). His taped statement therefore does not address the prosecution's theory—or the victim's testimony—as to force. *See* Gov't Ex. 15; DE85:37; DE88:9-11. Thus, against the evidence of Mr. Odely's guilt as to the "force" subsection of §1591(a), "[Mr. Odely] presented nothing. This absence deprive the jury of an alternative narrative." *See Ly*, 646 F.3d at 1318 (recognizing this absence prejudiced the defendant).

Had Mr. Odely followed through with his initial decision to testify, he would have testified contrary to D.M.C.'s, and government's, narrative. For example, he would have testified—as he did at his sentencing hearing—that he "didn't beat this young lady out here. [He] didn't force this young lady to do anything[.]" (DE89:10). He would have told the jury—as he apparently told his attorney—that he tried to take D.M.C. back to her family in Orlando, but she cut her wrist and

threatened to commit suicide in order to stay with him. (DE89:5). This evidence could have countered D.M.C.'s contention that he was violent with her at all—let alone "the majority of the time"—and that she tried to run away from him, but he chased her down. (DE85:37). Mr. Odely further would have testified—as he told Probation—that he was fully employed at a COVID testing site from January to April 2022. (PSR ¶ 65). This could have undermined D.M.C. and the government's argument that he made D.M.C. work for him because he "did not want to work." (DE85:19-20; DE88:9, 32). He also could have provided context mitigating his prior criminal history, including that none of his prior convictions involved a sex offense, or domestic violence; and his nine year sentence resolved all three of his prior convictions (including the first two, for which he was initially given a jail sentence followed by probation). *See* PSR ¶¶ 29-30.

Instead, Mr. Odely apparently succumbed to the district court's influence, and stayed silent.

This Court has recognized that "[t]he testimony of a criminal defendant at his own trial is unique and inherently significant" because, "[w]hen the defendant testifies, the jury is given an opportunity to

observe his demeanor and to judge his credibility firsthand." *Nejad v. Att'y Gen., State of Georgia*, 830 F.3d 1280, 1290 (11th Cir. 2016) (quoting *Nichols v. Butler*, 953 F.2d 1550, 1553-54 (11th Cir.1992)). The defendant's testimony is also of "prime importance" because "the very point of a trial is to determine whether an individual was involved in [the charged] criminal activity." *Nejad*, 830 F.3d at 1290 (quoting *Nichols* at 1554)). "In this context, [the Court] cannot conclude beyond a reasonable doubt that the district court's denial of [Mr. Odely]'s right to testify did not contribute to [Mr. Odely]'s conviction." *See Ly*, 646 F.3d at 1318. *Cf. Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991) ("As a general matter, it is only the most extraordinary of trials in which a denial of the defendant's right to testify can be said to be harmless beyond a reasonable doubt."). Thus, Mr. Odely's conviction must be vacated.

## V. The district court abused its discretion by denying the jury's request for a transcript of the testimony.

The jury submitted three notes during their deliberations. (DE29) As mentioned previously, in the first note, the jury requested the transcript that they had been shown previously, which purported to reflect what was said during Mr. Odely's videotaped statement to the FBI. *Id*. That request was denied. *Id*. Subsequently, the jury requested

assistance in hearing "the tape"—presumably of Mr. Odely's videotaped statement. *Id*. In response, they were provided with speakers for the laptop on which the tape could be played. (DE88:55). Finally, they requested "a transcript of the testimony given." (DE29).

While discussing the note outside of the presence of the jury, the district court stated that transcribing the entire trial would take too long. (DE88:53-57). Mr. Odely and his attorney requested that the district court inquire, specifically, what testimony the jury wanted transcribed. (DE88:52-54, 56-57). The prosecutor conceded that the note was "so vague, I don't know what they want a transcript of[.]"" (DE88:54). Nonetheless, the district court refused the defense request, and, over defense objection, instructed the jury that:

> You can't just push a button to get the transcript. It takes quite a bit of time to prepare transcripts, so I'm going to ask that you rely on your collective recollection of what the testimony was.

(DE88:55).

The district court—also outside the presence of the jury—stated that if the jury submitted yet another question, requesting a specific transcript, it would honor that request. (DE88:53, 56-57). Yet the jury was not told that such a request would be honored. Moreover, given the

district court's denials of their two requests for transcripts (including their request for a specific transcript), and the court's admonishment that "you can't just push a button to get the transcript," the jury must have believed that *no* transcript requests would be honored.

By refusing the defendant's modest request to inquire whether the jury had a more specific request—even while claiming that such a request, if made, would be honored—and affirmatively creating the impression that the jury could not access any transcripts, the district court abused its discretion. *See United States v. Pacchioli,* 718 F.3d 1294, 1306 (2013) (explaining that such decisions are reviewed for an abuse of discretion).

Further, the district court's response to the jury's note prejudiced Mr. Odely. *See id.* (holding that prejudice is required to establish an abuse of discretion). In closing argument, Mr. Odely's attorney had promised the jury that if, "You want certain things read back to you, we can do that." (DE88:24). The jury likely interpreted this statement to mean that they could obtain transcripts of the trial testimony. The district court's denial of the jury's requests for transcripts contradicted Mr. Odely's attorney, creating the impression that he misled them. If the

jury could not rely on Mr. Odely's attorney regarding a simple, procedural matter, then his legal arguments, too, were of questionable value to the jury. *Cf. United States v. Cardenas-Flores*, 974 F.2d 1343 (9th Cir. 1992) (Kleinfield, J., dissenting) ("A lawyer will have a hard time persuading a jury to value his closing argument if they are already persuaded that he has been trying to trick them."). Maintaining the credibility of Mr. Odely's attorney (and his arguments) was of the utmost importance to Mr. Odely's defense, especially because he did not mount an affirmative defense as to the "force" subsection. The district court's response to the jury's request for trial transcripts undermined the jury's trust in Mr. Odely's attorney, thereby prejudicing his defense, and amounting to an abuse of discretion.

## VI. Cumulative errors deprived Mr. Odely of a fair trial.

Each of the above errors, considered alone, is sufficient to require reversal of Mr. Odely's conviction and sentence. When considered cumulatively, vacatur is clearly required to preserve the fundamental right to a fair trial. *See generally United States v. Margarita Garcia*, 906 F.3d 1255, 1280 (11th Cir. 2018) ("The cumulative error doctrine provides that an aggregation of non-reversible errors . . . can yield a denial of the

constitutional right to a fair trial, which calls for reversal.") (quotation omitted); *Hands*, 184 F.3d at 1329 (observing that the cumulative effect of trial errors may require reversal even if the evidence is sufficient to establish guilt).

The injustice caused by these errors in Mr. Odely's trial is particularly stark as to the "force" subsection of § 1591(a)(1).

First, Mr. Odely, and the jury, were affirmatively mislead, by the indictment, the jury instructions, and the special verdict form, as to the elements of a "force" subsection offense. Moreover, they were misled in a way that made a conviction more likely, since the jury was told that no *mens rea* was required as to the use of force or coercion, and that force or coercion only had to further the offense, generally (rather than cause the victim to engage in sex trafficking). Considering the evidence at trial—including that the victim had been engaged in sex work prior to meeting Mr. Odely (DE85:59-91), that she and Mr. Odely had agreed to "rob" some of her customers because D.M.C. "didn't feel like having sex with" them anymore (DE85:31-35), and that she testified that Mr. Odely had been violent toward her, but disclaimed that he had "forced" her to work as a prostitute (DE85:47, 108)—the broadening of the elements caused by the

defective indictment, jury instructions, and special verdict form undermined Mr. Odely's defense as to the "force" subsection offense.

Next, the government's case agent provided an improper opinion which had the effect of bolstering the entirety of the victim's testimony. Yet the principal source of support for the government's "force" subsection theory came from D.M.C.'s testimony, parts of which were otherwise uncorroborated, and subject to reasonable doubt.

Then, the jury was erroneously informed that Mr. Odely had recently finished a nine-year prison sentence—but they were never told *not* to consider that patently prejudicial information when determining Mr. Odely's guilt. Next—and relatedly—the district court denied Mr. Odely's right to testify by misadvising him that the jury would only learn that he was a convicted felon if he testified. Yet the jury could infer that Mr. Odely was a convicted felon due to the earlier admission of his lengthy prior prison sentence. Because Mr. Odely was apparently swayed by the district court's lengthy inquiry, he ultimately did not testify—and the jury heard no mitigating evidence regarding his prior sentence, nor did receive any defense evidence undermining D.M.C.'s testimony, or the government's theory, as to the "force" subsection of § 1591(a)(1).

Finally, by denying the jury's second request for transcripts from the trial, the Court abuse its discretion and undermined the credibility of Mr. Odely's attorney. Because Mr. Odely did not present a defense case as to the "force" subsection, the credibility of his attorney was critical to establishing reasonable doubt.

# CONCLUSION

Based on the above argument and authority, Mr. Odely's conviction and sentence must be vacated.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

*/s/ Sara W. Kane*
SARA W. KANE
Assistant Federal Public Defender
1 E. Broward Blvd., Suite 1100
Fort Lauderdale, Florida 33301
Telephone: 954-356-7436

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation and typeface requirements of Fed. R. App. P. 32(a)(7)(B), because it contains 12,830 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Century Schoolbook font.

*/s/ Sara W. Kane*
SARA W. KANE

# CERTIFICATE OF SERVICE

I HEREBY certify that on this date, August 31, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and sent seven copies to the Clerk of the Court via third party commercial carrier for delivery within three days. I also certify that the foregoing document is being served this day via CM/ECF on Lisa Tobin Rubio, Assistant United States Attorney and on Daniel Matzkin, Chief, Appellate Division, Assistant United States Attorney, 99 N.E. 4th Street, Miami, Florida 33132.

*/s/ Sara W. Kane*
SARA W. KANE